IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SUSAN GOODLAXSON, et al., | * | |
| Plaintiffs, | * | |
| v. | * | CIVIL NO. JKB-21-1454 |
| MAYOR AND CITY COUNCIL OF BALTIMORE, | * | |
| | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM**

Pending before the Court are (1) Plaintiffs' Motion for Service Awards (ECF No. 138); (2) Plaintiffs' Motion for Attorneys' Fees and Costs (ECF No. 140); and (3) a Joint Motion for Final Approval of Partial Consent Decree (ECF No. 144). The Court held a Fairness Hearing on March 27, 2025. For the reasons stated in open court and discussed in more detail herein, the three Motions will be granted.

**I.    Factual and Procedural Background**

In June 2021, Plaintiffs filed this putative class action against the Mayor and City Council of Baltimore (the "City"). (ECF No. 1.) This case stems from Plaintiffs' allegations that the City failed to comply with Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504"). (*Id.*) In particular, Plaintiffs alleged that:

> The City of Baltimore's curb ramps, sidewalks, and pedestrian right-of-way are dilapidated, disintegrating, and filled with objects such as telephone poles, trash, and trees, making everyday travel difficult and dangerous for the thousands of people with mobility disabilities who call Baltimore home or visit for work or pleasure. Individuals with mobility disabilities are unable to travel freely around Baltimore because of these conditions, injuring their right to engage fully in Baltimore's civic life.

(*Id.* ¶ 2.) Plaintiffs alleged that "[a] substantial number of the street crossings within the City's

pedestrian right-of-way do not comply with applicable federal regulations addressing accessibility for people with mobility disabilities." (*Id.* ¶ 4.) Plaintiffs Susan Goodlaxson, Janice Jackson, and Keyonna Mayo are individuals with mobility disabilities, and Plaintiff IMAGE Center of Maryland ("IMAGE") is a non-profit independent living center that "advocates and promotes independent living for all persons with disabilities living in Central Maryland, including Baltimore." (*Id.* ¶¶ 6–7.) Plaintiffs sought injunctive and declaratory relief. (*Id.* ¶¶ 13, 88–90.)

Since the filing of this case, the parties engaged in numerous settlement discussions. The first session was held before Judge Charles Day in November 2021. In March 2022, the Court ordered the parties to file a joint proposal identifying the scope of documents that would facilitate the parties' settlement discussions. (ECF No. 40.) In April 2022, the Court approved the parties' Joint Proposal on Settlement-Related Discovery. (ECF No. 43, 44.) The proposal included 16 categories of documents to be produced by Baltimore to the Plaintiffs on topics including the construction and repair of curb ramps, sidewalks, roads, streets, and highways. (*Id.*)

The parties engaged in settlement negotiations in the summer and fall of 2022. (*See, e.g.*, ECF Nos. 61, 65.) The case was then referred to Judge Susan Gauvey for settlement. (ECF No. 73.) Since that referral, "the [p]arties have attended dozens of mediations and settlement discussions, including with the direct involvement of the Named Plaintiffs and the City Solicitor, the City's Budget Director, Director of the Department of Transportation, ADA Compliance Officer, and Department of Transportation Engineers." (ECF No. 122 at 7–8.) During the settlement discussions, the parties kept the Court apprised of the case's status, filing various Status Reports. (*See, e.g.*, ECF Nos. 89, 95 (reporting that the parties had engaged in multiple settlement conferences and discussions with Judge Gauvey, with more scheduled); ECF No. 100 (explaining that the parties continued to engage in settlement discussions, and were scheduling a meeting with the City Solicitor); ECF No. 109 (explaining that the parties continued to engage in settlement

discussions, and that the parties engaged in "an intensive information exchange" and that they were "scheduling a second conference with the City Solicitor and budgetary representatives").)

In a June 2024 Status Report, the parties reported that they had reached a settlement agreement in principle and were finalizing the documents to memorialize that agreement. (ECF No. 112.) The parties continued to finalize the agreement, which was ultimately approved by Baltimore's Board of Estimates. (*See* ECF Nos. 115, 117, 119.) Now pending before the Court is the parties' Joint Motion for Preliminary Approval. (ECF No. 121.)

## II.   Terms of the Partial Consent Decree

The Partial Consent Decree contains several requirements. (*See* ECF No. 123 at 37–68.) The Decree requires Baltimore to spend a minimum amount of funds per fiscal year[1] for four years (the "Annual Commitment") to (1) install accessible curb ramps at existing corners of Baltimore's pedestrian right of way and (2) remediate non-compliant existing curb ramps and pedestrian walkways. (ECF No. 122 at 9.)[2] Baltimore must spend $8 million in FY2024–25, and $12 million per year for FY2025–26, FY2026–27, and FY2027–28. (*Id.*) The Decree directs an allocation of funds between curb ramps and sidewalks such that:

> [T]he City will be spending between $5.6–$7 million on curb ramp accessibility and between $2.4–$3 million on pedestrian walkway remediation in FY 2024-25; between $7.8–$8.125 million on curb ramp accessibility and between $4.2–$4.325 million on pedestrian walkway remediation in FY 2025-26; between $7.8–$8.125 million on curb ramp accessibility and between $4.2–$4.325 million on pedestrian walkway remediation in FY 2026-27; and between $7.8–$9.75 million on curb ramp accessibility and between $4.2–$5.25 million on pedestrian walkway remediation in FY 2027-28.

(*Id.* at 10.) As explained by Plaintiffs' counsel:

---

[1] The City's fiscal year runs from July 1 to June 30 of the following year. (ECF No. 123 at 8.)

[2] Curb ramps and pedestrian walkways that are installed or remediated through new construction or alterations will be paid for separately from this Annual Commitment. (ECF No. 122 at 9.) The Decree also requires that the City ensure that all future construction and alteration work on curb ramps and pedestrian walkways be in compliance with disability access standards. (*Id.* at 11.)

> In practice, because the average cost of installing and/or remediating curb ramps is currently about $10,500 per ramp, this means that the Annual Commitment should yield approximately 533–667 curb ramps in FY 2024-25, 742–773 curb ramps in FY 2025-26, 742–773 curb ramps in FY 2026-27, and 742–928 curb ramps in FY 2027-28. The average cost per square foot of remediating pedestrian walkways is approximately $31.50 per square foot, meaning that the Annual Commitment should yield approximately 76,190–95,238 square feet of accessible pedestrian walkways in FY 2024-25; 133,333–138,889 square feet of accessible pedestrian walkways in FY 2025-26; 133,333–138,889 square feet of accessible pedestrian walkways in FY 2026-27; and 133,333–166,667 square feet of accessible pedestrian walkways in FY 2027-28. By comparison, over the past several years, the City has installed or remediated far less than 400 curb ramps per year, and has not performed any sidewalk remediation.

(ECF No. 123 at 9–10.)

If Baltimore receives more Highway User Revenue funding than anticipated from the State of Maryland in any given year, Baltimore will commit additional funding to the Annual Commitment. (ECF No. 122 at 9.) The Decree also provides that, if Baltimore becomes unable to appropriate the funds required to meet the Annual Commitment in a given year, the parties will meet and confer about alternatives. (*Id.*)

The Decree includes additional requirements summarized in the parties' briefing, including programs and activities aimed at remediating walkways such as inspections, meetings with utility companies and other regarding obstructions, and clearing obstructions; the enhancement of the City's 3-1-1 program; the appointment of a City ADA coordinator; and more. (*See* ECF No. 122 at 11–13.)

The Decree only partially resolves the pending litigation. Thus, as the parties explain:

> [T]he Partial Consent Decree sets forth the Parties' plan for future negotiations and a stay of litigation (and administrative closure of the case, except as needed for dispute resolution). In particular, twelve months before the expiration of the term, the Parties shall begin negotiating a plan to install and/or remediate the City's remaining curb ramps and pedestrian walkways such that all curb ramps and pedestrian walkways will be accessible. [Decree] at § III.C. Any agreement resulting from such negotiations will be the subject of a subsequent consent decree. *Id.* If the Parties are unable to reach an agreement through these future negotiations, the stay will lift and either party may request that the Court administratively re-open the case for further litigation.

(ECF No. 122 at 13.)

### III. Final Approval of Settlement

#### A. Settlement Approval Procedure

Approval of a class action settlement under Federal Rule of Civil Procedure 23 proceeds in two stages. At the first stage, the court examines the terms of the proposed settlement to determine whether it is "within the range of possible approval, subject to further consideration at the final fairness hearing after interested parties have had an opportunity to object." *CASA de Md., Inc. v. Arbor Realty Tr., Inc.*, Civ. No. DKC-21-1778, 2023 WL 6125531, at *4 (D. Md. Sept. 19, 2023) (citation and quotation marks omitted). Further, "[w]here a class-wide settlement is presented for approval prior to class certification, there must also be a preliminary determination that the proposed settlement class satisfies the prerequisites set forth in Fed. R. Civ. P. 23(a) and at least one of the subsections of Fed. R. Civ. P. 23(b)." *Curry v. Money One Fed. Credit Union*, Civ. No. DKC-19-3467, 2021 WL 3212584, at *2 (D. Md. July 29, 2021) (citation omitted). The Court previously made those findings. (*See* ECF Nos. 134, 135 (granting the motion for preliminary approval, conditionally certifying the settlement class, preliminarily granting the Partial Consent Decree, approving the class notice, and setting in additional dates and deadlines).)

At the second stage, after a final fairness hearing, the court approves the settlement if the proponents of the settlement satisfy their burden of showing that it is fair, adequate, and reasonable. *Id.* The Court held the requisite hearing on March 27, 2025.

#### B. Class Certification and Class Counsel

Plaintiffs propose the certification of the following Settlement Class:

All persons (including residents of and/or visitors to the City of Baltimore) with any Mobility Disability, who, at any time prior to court judgment granting final approval to this Partial Consent Decree have been denied full and equal access to the City's pedestrian right of way due to the lack of a Curb Ramp or a Pedestrian Walkway or Curb Ramp that was damaged, in need of repair, or otherwise in a

5

condition not suitable or sufficient for use.

(ECF No. 144-1 at 7 (alterations omitted).)[3]

Federal Rule of Civil Procedure 23 sets out the requirements for the certification of a class. "A plaintiff seeking class certification bears the burden of proving the proposed class complies with the requirements of Rule 23." *Gray v. Hearst Commc'ns, Inc.*, 444 F. App'x 698, 700 (4th Cir. 2011). In preliminarily approving the settlement, the Court previously preliminarily found that the Settlement Class met the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation. (*See* ECF No. 134 at 6–8.) The Court also found that the Settlement Class met the Rule 23(b) requirements. (*Id.* at 8–9.) The Court incorporates that analysis by reference, and concludes that nothing changes it. The Court continues to find that the Settlement Class meets the Rule 23(a) and (b) requirements. The Settlement Class will be finally certified.

Further, the Court incorporates by reference its analysis regarding the Named Plaintiffs and Class Counsel. (*See* ECF No. 134 at 7–9.) The Court continues to find that Goodlaxson, Jackson, Mayo, and IMAGE fairly and adequately represent the Settlement Class and should remain Named Plaintiffs, and that the appointment of Disability Rights Advocates ("DRA"), Disability Rights Maryland "(DRM"), Fox & Robertson, and Goldstein, Borgen, Dardarian & Ho ("GBDH") (now Dardarian Ho Kan & Lee) is appropriate.

### C. Notice

Rule 23(c)(A) provides that "[f]or any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class." Rule 23(e)(1)(B) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal if

---

[3] The capitalized terms are all defined in the Decree. (*See* ECF No. 123 at 39–42 (defining, *inter alia*, Mobility Disability, Curb Ramp, and Pedestrian Walkway).)

giving notice is justified by the parties' showing that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal."

The Court previously approved the proposed notice. (ECF No. 134 at 13–14.) And notice was provided in the manner approved by the Court. Namely: "In addition to posting this notice in English, Spanish, and Korean on the websites for Class Counsel and the City and publishing the notice in three periodicals, Class Counsel also mailed and emailed the notice to the twenty-nine (29) stakeholder organizations listed in Exhibit D to the Partial Consent Decree." (ECF No. 144-1 at 14–16.) Thus, the Court continues to find that notice was appropriate and reasonably calculated to apprise the class members of this action and their options in connection therewith.

### D. Decree

The parties seek the Court's final approval of the Decree. (*See generally* ECF No. 144.) Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a certified class . . . may be settled, voluntarily dismissed, or compromised only with the court's approval," and Rule 23(e)(2) requires that the Court find that a proposed settlement is "fair, reasonable, and adequate." "The primary concern addressed by Rule 23(e) is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations." *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991). The Fourth Circuit "has developed multifactor standards for assessing whether a class-action settlement is 'fair, reasonable, and adequate' under Rule 23(e)(2)." *In re Lumber Liquidators Chinese-Mfd. Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 952 F.3d 471, 484 (4th Cir. 2020).

The Court analyzed each of these factors in detail in its Memorandum preliminarily approving the Decree. (*See* ECF No. 134 at 10–13.) Nothing causes the Court to revisit that analysis, and the Court incorporates it by reference and adopts it.

Further, the parties have now provided more information that strengthens the Court's conclusion that the Decree should be finally approved. In particular, there have been no objections. (*See* ECF No. 151 (parties reporting that there have been no objections).) This weighs strongly in favor of finding that the Decree should be finally approved. "It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *West v. Cont'l Auto., Inc.*, Civ. No. 16-00502-FDW-DSC, 2018 WL 1146642, at *6 (W.D.N.C. Feb. 5, 2018) (citation omitted); *see also Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 461 (D. Md. 2014) ("The fact that no class member objected supports final approval of the Settlement as fair, adequate, and reasonable.").

The Court concludes that the settlement is fair, reasonable, and adequate, and should be approved.

## IV. Attorneys' Fees and Costs

Plaintiffs have filed a Motion for Attorneys' Fees and Costs. (ECF No. 140, as supplemented by ECF No. 150.) They seek "a total of $1,168,830.75 in attorneys' fees and $6,357.55 in costs, or a grand total of $1,175,188.30." (ECF No. 150 at 2.) Defendants do not oppose the request. (ECF No. 146.) In a class action, the court may award reasonable attorney's fees and nontaxable costs as authorized by law or by agreement. Fed. R. Civ. P. 23(h). The Court will award the requested fees and costs.

### A. Lodestar Analysis

The Fourth Circuit has explained that "[t]here are two main methods for calculating the reasonableness of attorneys' fees—the lodestar method and the percentage-of-recovery method"—and that a "district court may choose the method it deems appropriate based on its judgment and the facts of the case." *McAdams v. Robinson*, 26 F.4th 149, 162 (4th Cir. 2022). Here, where there

is no settlement fund, the Court concludes that the lodestar method is appropriate. *See, e.g., Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 575 (E.D. Va. 2016) ("Because there is no common fund in this case, the Court will evaluate Plaintiffs' Counsel's request for fees under the lodestar method.").

"The lodestar method calculates reasonable fees by multiplying the number of reasonable hours expended times a reasonable rate. There is a strong presumption that the lodestar figure is reasonable." *McAdams*, 26 F.4th at 162 (citation, quotations, and alterations omitted). The Fourth Circuit has explained that it

> has endorsed a three-part standard for use in calculating attorney's fees under the lodestar approach: First, the court must determine the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate. To ascertain what is reasonable in terms of hours expended and the rate charged, the court is bound to apply the factors set forth in *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). Next, the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones. Finally, the court should award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff.

*In re Lumber Liquidators*, 27 F.4th at 303 (quoting *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013)). "[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) (citation and internal quotation marks omitted).

### 1. Lodestar – Step One

At the first step, to ascertain the number of reasonable hours expended multiplied by a reasonable rate, the Court applies the *Johnson* factors, which include

> (1) the time and labor expended by counsel; (2) the novelty and difficulty of the questions presented; (3) the skill required to properly perform the legal services rendered; (4) the lawyer's opportunity costs in pressing the instant litigation; (5) the customary fee for similar work; (6) the lawyer's expectations at the outset of the litigation; (7) any time limitations imposed by the client or the circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the lawyer; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional

9

relationship between the lawyer and the client; and (12) attorney's fees awards in similar cases.

*In re Lumber Liquidators*, 27 F.4th at 303 (citing *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 & n.28 (4th Cir. 1978)).

The Court concludes that the number of hours expended is reasonable and that the hourly rates are likewise reasonable, in consideration of the *Johnson* factors. As Class Counsel reports, they 1,687.2 hours from the beginning of this matter to January 31, 2025 (ECF No. 140-2 at 296), and spent 244.5 since February 1, 2025 through March 18, 2025. (ECF No. 150-1 at 51.)[4]

Labor and Time Expended. The record reflects that the attorneys reasonably expended significant time and labor. While the Court is aware that "trial courts need not, and indeed should not, become green-eyeshade accountants" and they "may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time," *Fox v. Vice*, 563 U.S. 826, 838 (2011), the Court has carefully reviewed the nearly 300 pages of detailed billing records provided by counsel. (ECF No. 140-2 at 39–286; ECF No. 150-1 at 7–46.)

The Court concludes that the tasks for which counsel billed and the associated billing times were reasonable, as they included conducting the initial investigation, preparing a demand letter and the complaint, issuing discovery requests, reviewing discovery and analyzing data, preparing for and engaging in literally dozens of settlement discussions over the course of years, negotiating the Partial Consent Decree, preparing court filings, among other tasks. (*See generally* ECF No.

---

[4] The Court notes that although only four entities have been certified as Class Counsel, five entities seek fees. The Civil Rights Enforcement and Education Center ("CREEC"), now known as Disability Law United ("DLU") has not been certified as Class Counsel. Nevertheless, Timothy Fox, who was previously with CREEC, is now with Fox & Robertson, which *has* been certified as Class Counsel.

The Court finds it appropriate to award fees to Mr. Fox and his team at CREEC. The Advisory Committee's Note to Federal Rule of Civil Procedure 23(h) provides that: "This subdivision does not undertake to create new grounds for an award of attorney fees or nontaxable costs. Instead, it applies when such awards are authorized by law or by agreement of the parties. Against that background, it provides a format for all awards of attorney fees and nontaxable costs in connection with a class action, *not only the award to class counsel."*

140-2 at 39–286; ECF No. 150-1 at 7–46.) The Court concludes that this is reasonable, considering the length of this case and the labor expended to arrive at a settlement.

In addition to the number of hours worked, the Court has closely reviewed the billing records to confirm counsel's representation that it has omitted "hours for duplicative or unnecessary work; media activities; preparing Plaintiffs' quarterly fee statements pursuant to Guideline 1.c of Appendix B of the Local Rules and otherwise reviewing and reconciling time and fee records; time entries that were insufficiently detailed or vague; and administrative work including downloading pleadings, formatting and preparing correspondence, calendaring, and arranging conference call lines for status conferences." (ECF No. 140-1 at 9–10.) Counsel also represents that they removed entries for individuals who billed fewer than 20 hours to this case. (*Id.* at 10.) As counsel represents, this excision resulted "in a reduction of approximately 19% of all hours worked, and a 34% reduction in fees incurred." (*Id.* at 10.) The Court has also reviewed the billing records to confirm Class Counsel's representation that they endeavored to "avoid unnecessary duplication of work" and had "different firms taking on different primary roles." (ECF No. 140-2 at 19.) The Court also concludes that the hours billed are reasonable upon this review. While there appears to have been some overlap in work by various Class Counsel, such overlap appears reasonable, given the complexity of the case and the need for Class Counsel to be aligned on strategy and other matters.

<u>Novelty and Difficulty of Questions Presented; Skill Required; and Experience, Reputation, and Ability of Counsel.</u> This case presented novel and difficult issues, which required skilled counsel with relevant experience and ability.

As Plaintiffs explain, this case presented a question of first impression. (ECF No. 123 at 32 (explaining that the Fourth Circuit has not addressed whether pedestrian walkways are "services, programs, or activities" within the meaning of Title II of the ADA).)

More importantly, the complexity and difficulty of settling a case of this magnitude warrants finding that Class Counsel's proposed lodestar amount is reasonable. The record reflects that settlement negotiations were hard fought and involved multiple stakeholders. (*See, e.g.*, ECF Nos. 71, 89, 100, 109 (status reports); ECF No. 140-2 at 13 (Dardarian declaration explaining that "[f]or over three years following the filing of Plaintiffs' complaint, the parties engaged in vigorous settlement discussions" and that the parties "engaged in dozens of mediations and settlement discussions, including with the direct involvement of the Named Plaintiffs and the City Solicitor, the City's Budget Director, Director of the Department of Transportation, ADA Compliance Officer, and Department of Transportation Engineers")). And the Court agrees with Class Counsel's assessment that "[t]he process of settling a case like this one is exponentially more complicated than settling a class action for primarily monetary relief." (*Id.* at 14 (Dardarian Declaration).) These negotiations resulted in a detailed and thoughtful Partial Consent Decree, which provides significant relief for the Settlement Class over a multi-year period. In short, it is no small feat to achieve a settlement of the type negotiated here.

This complexity—and the result achieved here—speaks to counsel's skill and ability. Further, as the record reflects, Class Counsel are experienced in this area of litigation. (*See* ECF No. 140-2 at 2–11 (Dardarian declaration describing GBDH's, Dardarian's and other counsel's experience in disability, civil rights, and other class action litigation); ECF No. 140-3 at 2 (Reichman declaration describing DRA's experience in disability rights litigation); ECF No. 140-4 at 1–4 (Fox declaration describing his experience in disability rights litigation at both CREEC at Fox & Robertson); ECF No. 140-5 at 1–5 (Rubinstein declaration describing DRM's experience in disability rights litigation).)

Opportunity Costs; Expectations at the Outset; and Undesirability of the Case. In general, "[c]ases taken on contingency, although a common practice, are even less desirable as there is no

guarantee of payment or reimbursement of expenses." *Matias Guerra v. Teixeira*, Civ. No. TDC-16-0618, 2019 WL 3927323, at *7 (D. Md. Aug. 20, 2019). Here, Class Counsel has not been paid any fees to date. For instance, DRA explains that they take cases "on what is essentially a contingent fee basis, in which we do not charge any fees to our clients, but rather seek fees at the end of a case under statutory provisions that allow the prevailing party to recover their reasonable attorneys' fees and costs." (ECF No. 140-3 at 2–3; *see also id.* ("Unless contingent risk is accounted for by an award of attorneys' fees, plaintiffs seeking to enforce important civil rights cases would face substantial difficulty in obtaining counsel.").) Further, "DRM does not charge its clients fees" and it is a "private, nonprofit 501(c)(3) public interest law firm, and the designated Protection and Advocacy (P&A) system for people with disabilities in Maryland, pursuant to federal statutory authority." (ECF No. 140-5 at 1–2; *see also id.* at 9 ("DRM has not received any compensation to date for its work on this case . . . [and] all fees and costs [to be awarded by the Court] are distributed back into the programs that fronted the costs to begin with to fund future work in fulfillment of our mission and responsibilities as the P&A system for Maryland").

Amount in Controversy and Results Obtained. While the Court must assess the results obtained in its consideration of the *Johnson* factors at step one of the lodestar analysis, the Court is also required to assess the degree of success at the third step of the lodestar analysis. *Matias Guerra*, 2019 WL 3927323, at *7 (describing this apparent duplication, and explaining that "I will . . . apply all the *Johnson* factors when assessing the lodestar amount. However, the ultimate impact of the degree of success in this case will be considered in step three of the analysis.").

Thus, a more in-depth analysis of Plaintiffs' success follows at step three of the analysis below. The Court only notes here that the results obtained for the Plaintiffs have been very good. In short, Class Counsel have secured significant benefits for the Settlement Class, which go straight to the heart of Plaintiffs' allegations and will result in the City's provision of substantial

13

resources to remediate alleged access barriers.

Fee Awards in Similar Cases. In addition, "[a]n hourly rate is reasonable if it is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Duprey v. Scotts Co. LLC*, 30 F. Supp. 3d 404, 412 (D. Md. 2014) (quoting *Blum v. Stenson*, 465 U.S. 886, 890 n.11).

Class Counsel seeks to be reimbursed at hourly rates that range from $550 to $775 for partners, managing attorneys, and supervising attorneys; $505 to $575 for staff attorneys; and $225 to $330 for paralegals, interns, and law clerks. (*See* ECF No. 140-1 at 10–12.) While these rates exceed the presumptively reasonable rates laid out in this Court's Local Rules, the Court concludes that they are reasonable.

Class Counsel provides evidence that these rates are reasonable and in line with the rates charged by similarly-situated attorneys. They provide a declaration from Baltimore form Brown, Goldstein, and Levy, LLP explaining that the requested rates are "consistent with those [Brown, Goldstein, and Levy] charges to paying clients in 2025." (ECF No. 140-1 at 12.) They also point to the rates reported in the 2023 edition of Wolters Kluwer's Real Rate Report, which are in line with those sought by Class Counsel. (*Id.*) Class Counsel also points to other cases in this district where the Court has approved similar or higher rates in the context of class actions. *See, e.g.*, *Wojcik v. Omega Healthcare Investors, Inc.*, Civ. No. JKB-20-3491, 2024 WL 3743081, at *7 (D. Md. Aug. 8, 2024) (approving rates ranging from $750 to $975 for partners and $375 to $625 for law clerks).

The Court also concludes that these hours are reasonable based upon the experience of counsel and their expertise. Many of the attorneys have decades of experience. (*See* ECF No. 140-1 at 10–12 (providing that certain of the attorneys have been practicing for 26 to 38 years).) Further, as described above and as provided in declarations submitted by Class Counsel, Class

14

Counsel are very experienced in this area of law. The Court also notes that Class Counsel did not use their standard rates, but rather discounted rates. This further weighs in favor of finding that the fee award is reasonable.

Nature and Length of Professional Relationship and Time Limitations. Plaintiffs' counsel does not address these factors, and the Court finds that they are not significant in this case. *See, e.g., Matias Guerra*, 2019 WL 3927323, at *8 ("In considering the factors laid out in the Johnson case, there are a couple that are not significant to this case. These include: factor 7 - the time limitations imposed by the client or circumstances; and factor 11 - the nature and length of the professional relationship between attorney and client.") (citation and internal quotation marks omitted)).

**2. Lodestar – Steps Two and Three**

The Court next turns to the second and third steps of the lodestar analysis. At these steps, "the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones. Finally, the court should award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." *In re Lumber Liquidators*, 27 F.4th at 303 (citation omitted).

The Court concludes that it need not subtract any fees for hours spent on unsuccessful claims. Plaintiffs filed suit seeking declaratory and injunctive relief with respect to allege ADA and Rehabilitation Act violations, and they were successful in obtaining a settlement that remedies those concerns. Thus, there were no unsuccessful claims here that merit a subtraction of fees.

With respect to the degree of success,

> The court will reduce the award if "the relief, however significant, is limited in comparison to the scope of the litigation as a whole." *Hensley v. Eckerhart*, 461 U.S. 424, 439–40 (1983). Indeed, the Supreme Court has recognized that the extent of a plaintiff's success is "the most critical factor" in determining a reasonable attorney's fee . . . . *Id.* at 436. What the court must ask is whether "the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Id.* at 434.

15

*McAfee*, 738 F.3d at 92. The Court concludes that Class Counsel achieved great success here. Again, Class Counsel sought declaratory and injunctive relief with respect to allege ADA and Rehabilitation Act violations. Among the relief Plaintiffs sought was for the City to be enjoined to, *inter alia*, "[e]nsure that the City constructs, remediates, repairs, and maintains curb ramps and sidewalks such that, when viewed in its entirety, the City's pedestrian right-of-way is readily accessible to and usable by individuals with mobility disabilities" and "[e]nsure that the City constructs, remediates, repairs, and maintains curb ramps and sidewalks such that facilities in which City programs, services, and activities are made available to the public are readily accessible to and usable by individuals with mobility disabilities." The Consent Decree provides exactly that relief. The Consent Decree provides a creative solution to an allegedly longstanding problem, and provides for years of relief.

Therefore, the Court finds that Class Counsel should be awarded the $1,168,830.75 in attorneys' fees that they seek.

### B. Costs

Under Federal Rule of Civil Procedure 23(h), the Court may award reasonable costs. Costs that may be charged include "those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services." *Spell v. McDaniel*, 852 F.2d 762, 771 (4th Cir. 1988). Expenses may include court costs, transcripts, travel, contractual personnel, photocopying, postal fees, telephone costs, and expert witness fees. *Kelly*, 2020 WL 434473, at *7; *see also Boyd*, 299 F.R.D. at 468 (approving expense request that included "filing fees, expert and mediation fees, travel costs, computer research, copies, and other miscellaneous costs," and concluding that these expenses were "reasonable and typical").

Class Counsel seeks $6,357.55 in costs. (ECF No. 150 at 2; *see also* ECF No. 140-2 at 299–300; ECF No. 150-1 at 48–49.) This includes expert service fees, filing fees, courier services,

printing costs, travel, and research costs. (*Id.*) These are the type of costs commonly awarded as reasonable litigation expenses, and will be approved.

V.   **Service Awards**

Plaintiffs seek that the Court award $10,000 to each named Plaintiff (i.e., Susan Goodlaxson, Janice Jackson, Keyonna Mayo, and the IMAGE). (ECF No. 138.) The Court concludes that this request is reasonable, and the Motion for Service Awards will be granted. (ECF No. 138.)

"Incentive awards are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Berry v. Schulman*, 807 F.3d 600, 613 (4th Cir. 2015) (quotation marks and citations omitted). "To determine whether an incentive payment is warranted, the court should consider 'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.'" *Decohen v. Abbasi*, LLC, 299 F.R.D. 469, 483 (D. Md. 2014) (citing *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)).

The requested service awards are appropriate. The record reflects that the named Plaintiffs have been actively involved in this litigation, and have expended considerable time and effort. (*See* ECF No. 123 (Dardarian declaration explaining that "[t]he Named Plaintiffs have each been actively involved in this case" and that the named Plaintiffs "expended considerable time and effort initiating this litigation, participated in numerous settlement meetings with the City, including many where the Plaintiffs faced animosity from City representatives, and consulted with Plaintiffs' counsel with regard to settlement that will ultimately provide substantial benefits for the Class"); ECF Nos. 124–26 (Goodlaxson, Jackson, Mayo Declarations describing their involvement in this

case and estimating that they have each spent between 80-100 hours on this case); ECF No. 127 (Declaration from the Executive Director of the IMAGE Center describing the actions the IMAGE Center has taken in furtherance of the litigation, including that it "has been in close contact with our attorneys throughout the course of this case for nearly four years" and explaining that "[t]he IMAGE Center's representatives collectively have spent over 100 hours on this case"). Further, unlike other class members, the named Plaintiffs have agreed to release the City from any claims for monetary relief they may have through the effective date of the Partial Consent Decree. (*See, e.g.* ECF No. 123 (Dardarian Declaration explaining that "[t]he Named Plaintiffs will release the City from all claims of monetary relief they have through the effective date of the Partial Consent Decree relating to the accessibility of the City's curb ramps and pedestrian walkways").)

In addition, a $10,000 award per Named Plaintiff is in line with service awards granted in this district. *See, e.g., Feinberg v. T. Rowe Price Grp., Inc.*, 610 F. Supp. 3d 758, 774 (D. Md. 2022) (approving service awards of $10,000 to $15,000).

Accordingly, the Motion for Service Awards will be granted.

## VI. Conclusion

For the foregoing reasons, the Court will grant (1) Plaintiffs' Motion for Service Awards (ECF No. 138); (2) Plaintiffs' Motion for Attorneys' Fees and Costs (ECF No. 140); and (3) a Joint Motion for Final Approval of Partial Consent Decree (ECF No. 144).

DATED this 31 day of March, 2025.

BY THE COURT:

_____
James K. Bredar
United States District Judge